In the

# United States Court of Appeals

### For the Seventh Circuit

———————————

No. 14-2153

MISO TRANSMISSION OWNERS, *et al.*,

*Petitioners,*

*v.*

FEDERAL ENERGY REGULATORY COMMISSION, *et al.*,

*Respondent.*

———————————

No. 14-2533

LSP TRANSMISSION HOLDINGS, LLC, *et al.*,

*Petitioners,*

*v.*

FEDERAL ENERGY REGULATORY COMMISSION, *et al.*,

*Respondents.*

———————————

No. 15-1316

LSP TRANSMISSION HOLDINGS, LLC, *et al.*,

*Petitioners,*

*v.*

FEDERAL ENERGY REGULATORY COMMISSION, *et al.*,

*Respondents.*

———————————————

Petitions for Review of Orders of the
Federal Energy Regulatory Commission.
Nos. ER13-187-000, ER13-187-001, ER13-187-002, ER13-187-003, ER13-187-004, ER13-186-000, ER13-186-001, ER13-89-000, ER13-101-000, ER13-101-001, ER13-84-000, ER13-95-000

———————————————

ARGUED FEBRUARY 8, 2016 — DECIDED APRIL 6, 2016

———————————————

Before POSNER, EASTERBROOK, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. We have consolidated for decision three closely related cases challenging rulings by the Federal Energy Regulatory Commission. All involve what are called "rights of first refusal," which in the present context mean rights to have a first crack at constructing an electricity transmission project—that is, having the opportunity to build it without having to face competition from other firms that might also like to build it. The electrical companies involved in these cases are all members or potential members of the vast Regional Transmission Organization called MISO, an acronym for Midcontinent Independent System Operator. MISO monitors and manages the electricity transmission grid in its region (which embraces a number of midwestern and southern states, plus the Canadian province of Manitoba, all as shown in the map below), by balancing the

load so that lines don't carry too much (or too little) power, making sure that the power can be delivered without tripping safeguards that block damage to other lines, setting competitive prices for transmission services, and planning and supervising the expansion of the electrical transmission system throughout its vast region. See, e.g., "Midcontinent Independent System Operator," https://en.wikipedia.org/wiki/Midcontinent_Independent_System_Operator (visited March 31, 2016, as were the other websites cited in this opinion).



Regional Transmission Organizations, such as MISO, emerged because transmitting the right amounts of electricity to the right places to serve consumers requires coordinating transmission throughout a region, and an independent system operator can coordinate the transmission system in a way that among other things promotes competition among the producers of electrical power. Federal Energy Regulatory Commission, "Energy Primer: A Handbook of Energy Market Basics" 40, 47, 58–61 (November 2015), www.ferc.gov/market-oversight/guide/energy-primer.pdf; *Illinois Commerce*

*Commission v. FERC*, 721 F.3d 764, 769–70 (7th Cir. 2013). In addition to the functions performed by MISO that we've already mentioned, its control over all network transmission facilities in its region enables it to provide open-access transmission service, allocate transmission revenues, and maintain system security. *Midwest Independent Transmission System Operator, Inc.*, 84 FERC ¶ 61231 at p. 62139.

Until 2011, if MISO decided that another transmission facility was needed in some part of its domain the MISO member that served the local area in which the facility would be built had the first crack at building it. The reason was that the contract among the MISO transmission owners contained a right of first refusal. But that year FERC issued Order No. 1000, requiring transmission providers to participate in regional transmission planning intended to identify worthwhile projects, and to allocate the costs of the projects to the parts of the region that would benefit the most from the projects. To facilitate the implementation of such planning the order directed the transmission providers "to remove provisions from [FERC] jurisdictional tariffs and agreements that grant incumbent transmission providers a federal right of first refusal to construct transmission facilities selected in a regional transmission plan for purposes of cost allocation." *Transmission Planning & Cost Allocation by Transmission Owning & Operating Public Utilities*, Order No. 1000, 136 FERC ¶ 61051 at P 253, 76 Fed. Reg. 49,842, 49,885.

Granting a right of first refusal to build a project makes sense when the grantee clearly is best suited to build it, so that it would be a waste of time to invite and conduct competitive bidding. Apparently that used to be the situation in what is now MISO's region, but by 2011 FERC was con-

vinced that competition among firms for the right to build transmission facilities would result in lower rates to consumers of electricity. There would be a low bidder, and the lower his bid and therefore (in all likelihood) the cost of the facility he built, the lower would be the rates charged consumers of the electricity transmitted by the facility. In contrast, when the local firm has a right of first refusal an outsider will have little incentive to explore the need for a new transmission facility because the local firm would be likely to say to the outsider (*sotto voce*) "thank you very much for identifying, at no cost to me, a lucrative opportunity for me to exploit," and thus the outsider would be unable to recoup the cost of his research into the need for the new facility. See Order No. 1000, *supra*, 136 FERC ¶ 61051 at P 257; see also *South Carolina Public Service Authority v. FERC*, 762 F.3d 41, 72 (D.C. Cir. 2014).

No one likes to be competed against. A firm blessed with a right of first refusal can by exercising its option exclude competition with it, in this instance competition in building a new transmission facility. So naturally members of MISO in areas in need of additional facilities oppose Order No. 1000. They want to retain their right of first refusal—they don't want to have to bid down the prices at which they will build new facilities in order to remain competitive. And so while legal challenges to the order eliminating rights of first refusal have already failed, see *South Carolina Public Service Authority v. FERC, supra,* 762 F.3d at 48–49, 72–82, the MISO transmission owners are trying to prevent the order from applying to them by arguing that FERC must *presume* that their contractual right of first refusal is reasonable.

But why? The owners have made no effort to show that the right is in the public interest. Neither in their briefs nor at oral argument were they able to articulate any benefit that such a right would (with limited exceptions discussed later in this opinion) confer on consumers of electricity or on society as a whole under current conditions. Counsel did say at oral argument that MISO benefits consumers and that the transmission owners would not have formed it without a right of first refusal, but didn't say that MISO is likely to fall apart as a consequence of the repeal of the right. Although it originated as a contract right based on arms'-length negotiations among the companies that joined MISO and was thus a right created by contract, contract rights are not sacred, especially when they curtail competition. Until Order No. 1000 was promulgated, every member of MISO had a protected monopoly, created by the right of first refusal, regarding the construction of new facilities in its service area. That created a potential for higher rates to consumers of electricity than if competition to create transmission facilities in transmission companies' service areas was allowed, as FERC decreed in its order.

The MISO transmission owners tell us that granting rights of first refusal was intended not to curtail competition but to recognize that "competition in transmission development was not contemplated" and therefore the purpose of the relevant section was simply to allow MISO to require transmission owners to build needed facilities in their service areas. But that makes no sense. Had there been no intention or expectation of competition, there would have been no need for a right of first refusal. A market that can support only one firm because conditions of supply and demand leave room for no more—what is called a "natural monopo-

ly"—has no need for a right of first refusal. Such a right implies a possibility of entry (why otherwise create such a right?)—in other words room for an additional firm or firms, yet the right enables the incumbent firm to ward off entry.

An amicus curiae brief filed by three electrical-transmission companies in support of FERC's abrogation of the right of first refusal asserts without contradiction that competition unless blocked by the right is feasible under current industry conditions. MISO counters weakly that the parties to the 1998 contract were "sophisticated." No doubt—sophisticated enough to understand the benefits of a contract that would give each party protection against competition in the creation of new facilities. Their sophistication could be counted on to lead them to protect their own interests, not those of potential new entrants.

MISO explains that the right of first refusal was "negotiated to ensure that Transmission Owners [belonging to MISO] were obligated to construct transmission facilities identified by the MISO planning process." But now that there is competition to construct such facilities, MISO has only to decide where the new facilities should be built, for the transmission companies will be quick to compete to be selected to build them. As FERC said in its March 22, 2013, Order on Compliance Filings and Tariff Revisions, "the negotiation that led to the provisions at issue here [was] among parties with the same interest, namely, *protecting themselves from competition in transmission development*." *Midwest Independent Transmission System Operator, Inc., et al.*, 142 FERC ¶ 61,215 at P 183 (emphasis added).

Not that competition is an unmixed blessing. It can result in costly duplication, and in politicking aimed at courting

favor with MISO or FERC or for that matter Congress. But if there are indeed good things to be said about the rights of first refusal claimed by the petitioners, they are not said in any of the voluminous filings in this case. Instead the petitioners fall back on precedent, specifically the Supreme Court's companion decisions in *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332 (1956), and *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S 348 (1956). Only the second involves electricity, however, and since analytically the two cases are Siamese twins (joint creators of what is called the "*Mobile-Sierra* doctrine") we can limit our attention to the electricity case, *Sierra*.

A public utility that had made a contract to supply electric power to a company that would distribute it to consumers later filed a new, higher tariff rate with the Federal Power Commission (the predecessor to FERC) without the distributor's consent. The Commission found the new rate reasonable and therefore accepted it, remarking that the old rate had been too low to give the utility a fair return and was therefore "unreasonably low" within the meaning of section 206 of the Federal Power Act. The Supreme Court reversed, holding that while the Commission couldn't *require* a public utility to charge a rate that would produce less than a fair return, "it does not follow that the public utility may not itself agree by contract to a rate affording less than a fair return or that, if it does so, it is entitled to be relieved of its improvident bargain. In such circumstances the sole concern of the Commission would seem to be whether the rate is so low as to adversely affect the public interest—as where it might impair the financial ability of the public utility to continue its service, cast upon other consumers an excessive burden, or be unduly discriminatory." 350 U.S. at 355 (cita-

tion omitted); see also *Morgan Stanley Capital Group Inc. v. Public Utility District No. 1 of Snohomish County*, 554 U.S. 527, 545–46 (2008).

In other words, if a power company makes a contract that turns out to be disadvantageous to it but does no harm to the broader public, a regulatory commission has no business bailing the company out. It's a big boy; it took a risk; the risk materialized; but the adverse consequences are contained, they do not ramify, so there is no occasion for regulatory intervention. That was *Sierra*, interpreting the Federal Power Act in a case in which the parties brought adverse interests to the table and their contract could be assumed to have split the difference. That's different from a contract in which the parties are seeking to protect themselves from competition from third parties (cartels are the classic example of such contracts). In summary, FERC's abrogation of the right of first refusal in the MISO Transmission Owners Agreement was lawful.

Our second case concerns what are called "baseline reliability projects." These are projects the sole purpose of which is to solve problems of reliability in electrical transmission. FERC has allowed the transmission companies that MISO has authorized to build such projects in their respective service areas to retain a right of first refusal because the costs of such a project to consumers are limited to the service area of the company that builds the project rather than allocated across an entire region. Baseline reliability projects differ from multi-value projects, which are larger, have a regional focus, and benefit from regional cost sharing.

The petitioner in this second case, LSP, is a transmission company that would like to compete with the incumbent

transmission companies to build baseline reliability projects. It can't do so if an incumbent has a right of first refusal unless the incumbent decides it's not interested in building a particular such project. LSP argues that FERC's decision to allow this right of first refusal violates Order No. 1000.

FERC's justification for this departure from the order's emphasis on promoting competition is the benefit, which is surely very considerable, of a quick resolution of reliability problems. Delays will be inevitable if companies outside the service area are permitted to bid for the project, since competitive bidding takes time and may get bogged down in litigation.

LSP argues that by classifying baseline reliability projects as "local" FERC has exempted an entire type of transmission facility from regional cost sharing and the accompanying prohibition on rights of first refusal, and that this violates Order No. 1000. It's true that FERC is not allowed to exempt all reliability projects from cost sharing, Order No. 1000, *supra*, 136 FERC ¶ 61051 at P 690, but it can exempt some as long as other types of transmission projects that yield reliability benefits, such as multi-value projects, can be included in a regional plan for purposes of cost allocation.

LSP admits that Order No. 1000 does not prohibit the grant of rights of first refusal to transmission facilities "located solely within a public utility transmission provider's … territory … that [are] not selected in the regional transmission plan for the purposes of cost allocation." 136 FERC ¶ 61051 at P 63. But it objects when a baseline reliability project will span two or more pricing zones. It argues that such a project must be considered regional and that Order No. 1000 forbids allowing rights of first refusal for such projects.

But a transmission facility is not regional for purposes of cost allocation if all its costs are allocated to the pricing zone in which it is located. A right of first refusal would be problematic therefore only if the benefits of a baseline reliability project were largely or entirely realized in pricing zones other than the one in which the project was to be built. "FERC is not authorized to approve a pricing scheme that requires a group of utilities to pay for facilities from which its members derive no benefits, or benefits that are trivial in relation to the costs sought to be shifted to its members." *Illinois Commerce Commission v. FERC*, 576 F.3d 470, 476 (7th Cir. 2009). But FERC's calculations suggest that the spillover of benefits to other zones is modest enough to make the local allocation of costs "roughly commensurate" with the allocation of benefits. *Id.* at 477.

We come to our third and final case, also brought by LSP, which wants to expand its operations in the MISO region. It challenges three obstacles erected by FERC. The first is the commission's approval of MISO's refusal to base authorization of new projects exclusively or primarily on estimates of the cost of building transmission facilities—estimates that tend to be uncertain because of the complexity of such projects. In deciding which company to authorize to build such a project, MISO with FERC's consent considers a variety of factors that include the project's design, the quality of its management, and management's ability to complete the project within a reasonable time and with proper provision for dealing with future outages and other problems that beset electrical transmission systems. Cost estimates are considered too but are not necessarily the primary factors. The broader criteria employed by MISO with FERC's approval relate directly to efficiency, cost-effectiveness, and reliability,

all of which translate into lower rates for consumers. See 16 U.S.C. §§ 824d(e), 824e(a). And there is no indication that any of MISO's criteria favor incumbent developers over non-incumbent ones who have demonstrated an equal ability to execute a project effectively.

LSP also complains about FERC's having decided to allow MISO to include in its tariff a provision that allows it to honor rights of first refusal created by state and local law. Order No. 1000 terminated only federal rights of first refusal; it did not "limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities." Order No. 1000, *supra*, 136 FERC ¶ 61051 at P 227. FERC wanted "to avoid intrusion on the traditional role of the States" in regulating the siting and construction of transmission facilities. *South Carolina Public Service Authority v. FERC, supra,* 762 F.3d at 76.

That was a proper goal even though LSP has cited state laws that might interfere with regional transmission development. In Minnesota, for example, "an incumbent electric transmission owner has the right to construct, own, and maintain an electric transmission line that has been approved for construction in a federally registered planning authority transmission plan and connects to facilities owned by that incumbent electric transmission owner." Minn. Stat. § 216B.246. When a regional transmission line connects to a Minnesota transmission owner's facilities, therefore, outsiders are not allowed to compete to build that line if the Minnesota transmission owner chooses to build it.

LSP further complains that even if one grants that FERC can allow a state law to give an incumbent transmission company a right of first refusal, MISO should not be permit-

ted to exclude outsiders from competing. But it would be a waste of time for MISO to conduct a protracted competitive bidding and evaluation process when the incumbent transmission company has a right of first refusal conferred by state law.

Closely related to state rights of first refusal are state eminent-domain laws, which are germane to the construction of electrical transmission facilities because transmission lines require easements in order to be permitted to be built. FERC has decided that "it would be an impermissible barrier to entry to require, as part of the qualification criteria [for determining an entity's eligibility to propose a transmission project for inclusion in the regional transmission plan], that a transmission developer demonstrate that it either has, or can obtain, state approvals necessary to operate in a state, including … [conferral of] public utility status and the right to eminent domain." *Transmission Planning & Cost Allocation by Transmission Owning & Operating Public Utilities*, Order No. 1000-A, 139 FERC ¶ 61132 at P 441, 77 Fed. Reg. 32,184, 32,254. Thus FERC has not given MISO unlimited discretion to invoke state law when determining whether a non-incumbent is entitled to propose a project.

LSP's final complaint concerns FERC's decision to treat the combined retail distribution service areas of the electrical company Entergy Corp. as a single market (or "footprint," in the language of Order No. 1000-A, *supra*, 139 FERC ¶ 61132 at P 429) for purposes of determining whether proposed transmission projects in Entergy's market should be considered local rather than regional, even though Entergy does business in Texas, Arkansas, Louisiana, and Mississippi and does so through separate operating companies in each state.

Order No. 1000 eliminated federal rights of first refusal only for regional projects, not for local ones, as we know, yet the vast region covered by Entergy's multiple operating companies hardly complies with the usual understanding of "local." But "local" need not retain its usual understanding when used to designate the service area of a giant electrical transmission entity. It is a relative term; New York City is a huge city yet as a matter of scale is "local" relative to New York State, or to the Northeast. Entergy's retail distribution service territories can be said to be "local" for a different reason: the separate operating companies actually operate as one and have so operated for more than fifty years. See *Louisiana Public Service Commission v. FERC*, 522 F.3d 378, 383 (D.C. Cir. 2008).

To conclude, the petitions for review are

DENIED.