EASTERBROOK, Circuit Judge.
In 2005 Duke Energy Indiana offered to buy 100 megawatts of renewable energy at a price high enough to enable potential sellers to finance the construction of wind *299 turbines. As part of the deal Duke would acquire renewable-energy credits that buyers or generators of wind energy can trade or sell to other utilities that lack wind generation. Benton County Wind Farm (Benton) accepted Duke’s offer and built a 100-megawatt facility that became operational in 2008. The contract between Duke and Benton requires Duke to pay Benton for all power delivered during the next 20 years. Duke does not have.its own transmission lines in Benton County, and the contract requires Benton to deliver to lines owned by Northern Indiana Public Service Company (NIPSCO) or some other place designated by the regional transmission organization, the Midcontinent Independent System Operator (MISO).
Electrical grids throughout North America are connected, and it is essential to ensure that none of the transmission lines becomes overloaded or fails to convey power to customers that are counting on it. The ten regional transmission organizations in North America develop technical standards for how smaller networks connect with each other. They also employ tools to monitor networks in order to prevent overloads or imbalances, which can cause blackouts.- Our opinion in MISO Transmission Owners v. FERC, 819 F.3d 329 (7th Cir. 2016), describes some of this regulatory and coordination function, and it includes a map showing MISO’s territory, which spans the middle of the continent from Manitoba through Louisiana — all or part of 15 states plus one province. It shares Indiana with PJM- Interconnection, a regional transmission organization whose territory includes Chicago, New York City, and all or part of 13 states plus the District of Columbia. Only MISO’s decisions affect this case.
Regional transmission organizations have concluded that the price system is the best tool to balance loads on the networks. Potential buyers of energy bid for power to be delivered over the network (this is done principally through utilities such as Duke and NIPSCO, which aggregate end-users’ demands); potential sellers such as Duke (on behalf of Benton) also submit bids for sale, and the regional transmission organization accepts the bid that clears the market.
When Benton’s wind farm started producing, the bidding was conducted once a day. Now it is conducted every five minutes — necessarily by computers. MISO uses a variant of a Vickrey auction to decide which bids are accepted at what price. Here’s a simple illustration. Buyer 1 bids $60 per megawatt-hour (MWh) for 200 megawatts of power; Buyer 2 bids $40 for another 200; Buyer 3 bids $30 for a further 200. If the transmission grid in the area can carry 300 megawatts, then Buyer 1 gets 200 megawatts and Buyer 2 gets 100; Buyer 3 gets nothing. The bid price is set at $40 per MWh, which is what the marginal buyer is willing to pay; in a Vick-rey auction, all buyers and sellers receive the same price. (Treasury securities are sold using a similar system.) Meanwhile Seller 1 offers 100 megawatts at $20 per MWh, Seller 2 offers 100 megawatts at $30, Seller 3 100 megawatts at $40, and Seller 4 100 megawatts at $50. The market-clearing price and quantity are $40 for 300 megawatts. MISO accepts the bids from Sellers 1, 2, and 3, and all three receive $40 per megawatt-hour.
For some kinds of suppliers, such as wind farms, the marginal cost of generating any unit of output is small, even though the capital cost of building wind turbines is high. Rather than accept no sales, Seller 4 may cut its price to $10 per MWh. Then the prevailing offer would be $30 (enough to attract a total of 300 megawatts, the most'the local grid can carry), and all three buyers would pay $30. Sellers *300 1, 2, and 3 may not take this lying down. They-may cut their own bids. If all sellers bid only enough to cover their marginal costs, the price in such a market could fall to, say, $1 per MWh, and even at that price one of the four potential sellers would be unable to make a sale.
This is roughly what has happened in central Indiana. When Benton started operating it was the only wind farm in the area, and NIPSCO’s facilities could carry its entire output. Duke purchased and paid for everything Benton could produce, and MISO cleared the transfers to the regional grid. But central Indiana has excellent conditions for generating power from wind, and by 2015, when the district court issued its opinion, aggregate capacity of local wind farms was not 100 megawatts but 1,745 megawatts. More wind farms are being built, The capacity of the local transmission grid has been exceeded. It is no longer possible for all of the local wind farms to generate power at the same time, because the grid cannot accept their full output. And because, local generation capacity substantially exceeds local transmission capacity, the market-clearing price in MISO’s auction has fallen — indeed, ■ the price sometimes is negative, and :then would-be producers must pay MISO to take the power qff their hands, and buyers get free electricity. Prices near or below zero induce some producers to stop supplying electricity and thus reduce output to what the grid can carry.
Until the end of February 2013 MISO allowed wind farms to deliver to the .grid no matter what other producers (coal, nuclear, solar, hydro, and so o.n) were doing, which meant that other classes of producers had to cut back. Sometimes the market price, in this must-carry-wind-power system fell below zero, which meant that wind generation alone had overtaxed the local grid. When that happened Duke paid a negative price, displacing other wind farms to ensure that Benton ran at capacity, So if the auction price was minus $10/MWh, Duke would pay MISO that amount and pay Benton' for the power; it would receive nothing for this power (save the potential value of renewable-energy credits) and charge the loss to its customers. Duke could recover some of the loss in its role as a buyer of power from MISO’s grid, because even if the power on NIPSCO’s grid goes north (Duke’s operations are in southern Indiana), a lower price on NIP-SCO’s network will depress prices on other grids, which will buy from NIPSCO and tell other sources to curtail their own output. But Duke believes that it loses more in its role as seller of Benton’s power than it gains in its role as buyer from MISO.
On March 1, 2013, the rules changed to put wind farms constructed after 2005 on a par with other classes of producers. Benton lost its status as a must-run facility. Duke responded to the new system by deciding to bid exactly $0, all the time, to put Benton’s power on the grid. When this bid is accepted, Duke gets the market-clearing price (usually positive but sometimes zero) and pays Benton the contract price (roughly $52 per MWh). But when the market-clearing price in MISO’s auction falls below $0, and Duke’s bid therefore is rejected, MISO instructs Benton not to deliver any power. Once Benton generates power it must deliver it (otherwise it would fry its own equipment), so an order not to deliver power equates to an order not to generate power, and Benton must stop its turbines from rotating. Under MISO’s new system, with Duke’s standing bid of $0/MWh, Benton has gone from delivering power 100% of the time the wind allowed to delivering (and being paid) only 59% of the tíme that the weather can drive its turbines at their capacity.
*301 In this litigation Duke takes the position that, when MISO tells Benton to stop delivering power, it does not owe Benton anything. Benton takes the position that Duke could put Benton's power on the grid by making a lower bid (MISO accepts bids as low as negative $500 per MWh), thereby displacing other producers’ power, and that when Duke elects not to do this it owes liquidated damages under the contract. Sometimes for load-balancing or other technical reasons MISO tells Benton to stop delivering power even when the market price exceeds zero and Duke’s bid nominally has been accepted. Benton acknowledges that in this situation Duke need not pay damages.
The district court sided with Duke, ruling that it need pay only for power delivered to the “Point of Metering” where it is measured and passes to the local grid; when MISO issues a stop order that quantity is zero. 2015 WL 12559885, 2015 U.S. Dist. Lexis 181563 (S.D. Ind. Oct. 9, 2015). The parties have a second contract that requires Duke to cooperate, reasonably, in marketing Benton’s power; the district judge found that bidding $0 is “reasonable” cooperation because it usually leads Duke to suffer an out-of-pocket loss, since the market price will be less than what Duke must pay Benton. Indeed, on this understanding Duke might be entitled to bid $52 in MISO’s auction and ensure that it makes a profit on reselling every megawatt-hour that it buys from Benton.
This is a contract dispute, so we must set out the contractual clauses that matter. We have tried to be parsimonious; interested readers can find more details in the district court’s opinion. There are two contracts—the first requiring Duke to buy Benton’s power, the second requiring Duke to cooperate with Benton. The parties call the first the Renewable Wind Energy Purchase Power Agreement or PPA; they call the second the Joint Energy Sharing and Operating Agreement or JESOA. We discuss the second contract briefly at the end of this opinion. For now, we refer- to the first contract as “the contract.”
 We have already mentioned one clause. The contract requires Duke to purchase Benton’s output, which it defines as “the entire electrical output of the Plant delivered to the Point of Metering” (emphasis added). A separate clause defines that point as where Benton connects with the local grid (either NIPSCO’s or another designated by MISO). Benton relies principally on § 4.6(a) of the contract, a liquidated-damages clause captioned “Buyer’s Failure to Accept Delivery of Electrical Output”:
In the event that Buyer fails to accept delivery of all of the Electrical Output at the Point of Metering, whether due to Buyer’s failure to obtain Transmission Service (if applicable) or for any reason other than Seller’s failure to perform, an Emergency Condition, a Force Majeure Event that prevents such acceptance pursuant to Article 14 or the proper exercise by Buyer of its suspension rights pursuant to Section 15.2(a), then Buyer shall pay to.Seller as liquidated damages an amount equal to the positive difference,, if any, between (i)(x) the amount that would have been payable by Buyer to Seller hereunder if such Electrical Output had been accepted by Buyer plus (y) additional transmission charges, if any, reasonably incurred by Seller in delivering the Electrical Output to such third party purchaser-and (ii) the net amount, if any, that Seller using Commercially Reasonable Efforts, actually realizes through remarketing of such Electrical Output to Persons other than Buyer, 'provided that in the event Seller is unable to remarket such Elec *302 trical Output, then the net amount described in clause (ii) shall be $0 and the damages owed by Buyer shall also include the then-current amount of the PTC (on a per MWh basis) on an After-Tax Basis for each MWh of such Electrical Output that Seller was unable to remarket. The damages provided in this Section 4.6 shall be the sole and exclusive remedy of Seller for any failure of Buyer to accept delivery of Electrical Output that it is required to accept hereunder.
One more long clause matters. It is § 6.4, captioned “Transmission”:
Buyer represents that it intends to deliver and sell all of the Electrical Output to [MISO] at the Point of Metering and does not intend to utilize any Transmission Services. If Buyer nevertheless utilizes Transmission Services for the Electrical Output during the Term or is required (due to a change in the applicable transmission rules) to use Transmission Services in order to accept deliveries of the Electrical Output at the Point of Metering, • then Buyer shall be responsible for arranging for all Transmission Services required to effectuate Buyer’s acceptance of delivery of and purchase of Electrical Output, including, without limitation, obtaining Transmission Service, in an amount of capacity equal to the Designated Nameplate Capacity -Rating, and shall be responsible for the payment of any charges related to such Transmission Services hereunder, including, without limitation, charges for transmission or wheeling services, ancillary services, imbalance, control area services, congestion charges, location marginal pricing, transaction charges and line losses. The Parties acknowledge that the purchase price of Electrical Output does not include charges for such Transmission Services, all of which shall be paid by Buyer.
Finally, there is a definition of “transmission services” as:
all transmission or wheeling services, scheduling services, imbalance services, OASIS, congestion and congestion management services, tagging services, dispatch services, ancillary services, control area services, and other transmission services necessary' for Buyer to accept Electrical Output at the Point of Metering and transmit, and deliver Electrical Output from the Point of Metering, using the highest priority transmission service available.
Many other clauses and definitions potentially have some bearing, but we think that these few decide the case. The parties agree that Indiana law governs, but they do not rely on any principles unique to Indiana. The dominant principle is that courts follow contractual language unless ambiguity permits the use of parol evidence. The parties agree that this contract is clear (though not on what it means), and we too think it unnecessary to go beyond the document’s language.
Benton tells us that § 4.6(a) is a take-or-pay clause, requiring Duke to pay for energy whether taken or not. The district court was not persuaded, and neither are we, for then it would require Duke to pay Benton even if the reason for non-delivery is an instruction that MISO issues independent of how much Duke bid in the auction and independent of how much transmission capacity is available. MISO might issue such an order if, for example, there is a decline in demand on the buyers’ side of the market or a technical fault in some other grid, which cannot accept as much power from NIPSCO’s lines.
Yet Benton concedes that Duke need not pay when it receives such a stop order. Duke says, without contradiction from *303 Benton, that the market-clearing price is positive 80% of the time and Duke’s $0 bid thus is accepted (just as a negative $500/ MWh bid would have been), but .that MISO allowed Benton to generate power only 59% of the time; the difference between 80% and 59% must be attributable to MISO’s decisions rather than Duke’s bid. If Duke need not pay Benton for energy when MISO’s choices, alone, account for non-generation, § 4.6(a) can’t be a standard take-or-pay clause. Nor does it call itself a take-or-pay requirement; it calls itself a liquidated-damages clause.
But the opposite view — that if energy is not generated and so does not cross the Point of Metering, and never counts , toward actual output, for any reason at all (including Duke’s entry of a standing $52/ MWh bid), then Benton need not be paid— also is unfaithful to the contractual language. Section 4.6(a) makes it clear that some reasons for Duke’s failure to take energy excuse payment; and from the limited range of reasons that justify nonpayment it follows that other reasons are inadequate and that payment remains due.
The key to resolving the parties’ dispute lies toward the beginning of § 4.6(a), which requires Duke to páy if it “fails to accept delivery of all of the Electrical Output at the Point of Metering, whether due to Buyer’s failure to obtain Transmission Service (if applicable) or for any reason other than ... [a list].” This covers the sort of situation that prevailed after MISO changed its dispatch rules at the end of February 2013 and no longer deemed Benton a must-carry generator. As of March 2013, Benton was being told to stop 41% of the time because transmission was unavailable at the price Duke was willing to offer — and could have been unavailable even if Duke had bid negative $500/MWh, if owners of the remaining local wind farms had made the same negative bid. With insufficient transmission capacity, someone (or a lot of someones) had to stop delivering energy to NIPSCO’s facilities no matter what price Duke offered.
But the contract provides what is to happen when the stoppage is “due to Buyer’s failure to obtain- Transmission -Services”. Duke is to pay for power not taken. Duke could build its own transmission lines or buy extra capacity from NIPSCO or some other firm. (Our opinion in MISO Transmission Owners 'describes the process by which MISO allocates the rights to build new lines or augment existing ones.) If there is a market for transmission services, as there surely is in central Indiana where more and more wind power is becoming available, then there will be a supply of transmission lines. It is only a matter of time until more capacity is built, whether by Duke or someone else. And § 4.6(a) tells us that, until this happens, Duke must pay Benton. The risk of inadequate transmission was contemplated by the contracting parties and allocated to Duke. By accepting this risk, Duke enabled Benton to finance its project; otherwise potential investors might have feared exactly the overcapacity situation that has come to pass. Duke wanted Benton’s facilities to exist and called them into existence by promising to pay even if a shortfall of transmission services should lead to curtailment of deliveries.
Duke resists that conclusion by pointing to the opening of § 6.4, and some equivalent language elsewhere in the: contract, which relate that Duke did riot plan or want to operate transmission lines, contemplated immediately handing Benton’s power to MISO at the Point of Metering, “and does not intend to utilize any Transmission Services.” That’s fine as a statement of Duke’s goal; maybe it believed that extra transmission capacity would be unnecessary of that NIPSCO would add to *304 its own capacity as wind farms were built. But § 6.4 does not say that Duke will never need to add transmission capacity itself or that it is excused from paying Benton if it chooses not to.
To the contrary, three parts of the contract strongly imply that Duke must do what is needed to make transmission capacity available. One is the contract’s definition of “transmission services” to include “other transmission services necessary for Buyer to accept Electrical Output at the Point of Metering” (emphasis added). The second is in § 4.6(a), which says that Duke must pay if the failure to deliver powér is caused by “Buyer’s failure to obtain Transmission Service (if applicable)”. Now go back to the second sentence of § 6.4 for the third, which tells us that “[i]f Buyer nevertheless utilizes Transmission Services for the Electrical Output during the Term or is required (due to a change in the applicable transmission rules) to use Transmission Services in order to accept deliveries of the Electrical Output at the Point of Metering” then Buyer (Duke) must pay the full cost. What would be the point of this clause, if Duke never has an obligation to obtain transmission service for the power Benton is able.to generate? Sections 4.6(a) and 6.4 read together tell us that Duke must arrange for new transmission services if they prove to be necessary for Duke to accept all of Benton’s power after a “change in [MISO’sj applicable transmission rules”.
The district court rejected this line of reasoning, 2015 WL 12559885 at *21,. 2015 U.S. Dist, Lexis 181653 at *71-73, because MISO has not required Duke to add transmission capacity. In other words, the court understood the word “required” in § 6.4 to mean “required by MISO” and the parenthetical clause “if applicable” in § 4.6(a) to mean “if required under § 6.4.” Yet § 6.4 does not say “required by MISO”. It says “required (due to a change in the applicable transmission rules) ... in order to accépt deliveries of the Electrical Output at the Point of Metering.” And “Electrical Output” is defined,- as we have already quoted,' as all of the power that Benton generates, not just the power that can coexist on NIPSCO’s lines with all other wind-generated power in the area. MISO’s role in § 6.4 is not to require Duke to build transmission capacity, but to change the rules of dispatching power over whatever transmission capacity happens to exist. MISO did that; the upshot was that it no longer accepted all of Benton’s output; and the consequence under § 4.6(a) and § 6.4- is that Duke must either build (or arrange for) more transmission capacity or pay Benton the amount specified in § 4.6(a).
Potential buyers and sellers of electricity could and did foresee when negotiating this contract (and others like it) that electrical grids may be swamped by new sources of renewable power, which usually is located far from the centers of demand. They needed to allocate the risk of that development, which predictably would compel MISO to alter its rules for which sources could put power on the grid. Allocating the risk to Benton would have made it hard, perhaps impossible, to finance the project’s construction, while leaving Duke and similar utilities no incentive to expand the regional grids as wind power became available. Allocating the risk to Duke facilitates both construction of renewable-energy sources and better incentives to match the size of the transmission grid to the capacity for local generation. We read this contract as allocating the risk to Duke, which. means, that Benton receives the compensation provided by § 4.6(a) and Duke has the right incentives to build or buy extra transmission capacity.
*305 Duke contended in the district court that MISO’s 2013 rules are an “Emergency Condition” for the purpose of § 4.6(a) and prevent any recovery. It has not renewed that argument on appeal, perhaps because it is hard to think of a long-term set of rules for pricing and dispatching power as an “emergency,” We could imagine an argument that an unanticipated change in MISO’s rules is enough of an “emergency” to give Duke time to build or acquire new transmission capacity without needing to compensate Benton in the interim, but MISO announced the new-rules years in advance and phased them in slowly. Duke did not attempt to add transmission capacity in the time between the rules’ announcement and their 2013 application to post-2005 wind farms — and as far as we can tell it has not attempted to build or buy new transmission capacity in Benton County since then. This line of argument therefore is unavailable.
We have so far not discussed the terms of the second contract, which the parties call JESOA. Because we have concluded that Benton prevails -under, the, first contract, the second would be important only if it entitles Benton to a larger recovery. The damages clauses of the two contracts differ (as do the clauses that determine each party’s responsibilities), so that it is possible in principle that Duke could be liable under one, the other, or both, and owe different damages under each. But we do not understand Duke to contend that its recovery under the second contract would exceed its recovery under the first. Indeed, Benton’s briefs in this court mention the second contract only once, in passing, and make nothing of it substantively. 'We therefore think it unnecessary to decide whether Duke is liable under the second contract and, if so, what damages that contract would provide.
. The judgment is reversed, and the case is remanded with instructions to determine the relief to which Benton is entitled.