In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 17-2433 & 17-2445

ELECTRIC POWER SUPPLY ASSOCIATION, *et al.*,

*Plaintiffs-Appellants*,

*v.*

ANTHONY M. STAR, Director of the Illinois Power Agency, *et al.*,

*Defendants-Appellees*.

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 17 CV 1163 and 17 CV 1164 — **Manish S. Shah**, *Judge*.

ARGUED JANUARY 3, 2018 — DECIDED SEPTEMBER 13, 2018

Before EASTERBROOK and SYKES, *Circuit Judges*, and
REAGAN, *District Judge*[*]

EASTERBROOK, *Circuit Judge*. Regional transmission organizations manage the interstate grid for electricity. See, e.g., *Benton County Wind Farm LLC v. Duke Energy Indiana, Inc.*,

_____

[*] Of the Southern District of Illinois, sitting by designation.

843 F.3d 298 (7th Cir. 2016); *MISO Transmission Owners v. FERC*, 819 F.3d 329 (7th Cir. 2016). Midcontinent Independent System Operator (MISO) and PJM Interconnection handle the grid in and around the Midwest. Many large generators of electricity sell most if not all of their power through auctions conducted by regional organizations, which are regulated by the Federal Energy Regulatory Commission. States must not interfere with these auctions. *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288 (2016).

Illinois has enacted legislation subsidizing some of the state's nuclear generation facilities, which the state fears will close. 20 ILCS 3855/1-75(d-5). These favored producers receive what the state calls "zero emission credits" or ZECs. (We call them credits.) Generators that use coal or gas to produce power must purchase these credits from the recipients at a price set by the state. The price of each credit is $16.50 per megawatt-hour, a number Illinois derived from a federal working group's calculation of the social cost of carbon emissions. (Coal and gas plants emit carbon dioxide; nuclear, wind, solar, and hydro plants don't.) The price per credit falls if a "market price index" exceeds $31.40 per megawatt-hour. Illinois derives this index from the annual average energy prices in the auction conducted by PJM and the prices in two of the state's regional energy markets. The adjustment is designed "to ensure that the procurement [of electricity] remains affordable to retail customers … if electricity prices increase". 20 ILCS 3855/1-75(d-5)(1)(B).

Plaintiffs (an association representing electricity producers, plus several municipalities) contend that the price-adjustment aspect of the state's system leads to preemption by the Federal Power Act because it impinges on the FERC's

regulatory authority. They concede that a state may take many steps that affect the price of power. It may levy a tax on carbon emissions. It may tax the assets and incomes of power producers. It may use tax revenues to subsidize some or all generators of power. It may create a cap-and-trade system under which every firm that emits carbon must buy credits in a market (firms that emit less carbon, or none, will be the sellers). As plaintiffs see matters, although such systems *affect* the price in the PJM and MISO auctions, they do not *regulate* that price. But the zero-emission-credit system, plaintiffs insist, indirectly regulates the auction by using average auction prices as a component in a formula that affects the cost of a credit. The district judge did not agree with this argument and granted summary judgment to the defendants. 2017 U.S. Dist. LEXIS 109368 (N.D. Ill. July 14, 2017).

The parties' briefs address a number of procedural questions. These include whether a claim of preemption may be presented directly under the Supremacy Clause of the Constitution and whether relief under the theory of *Ex parte Young*, 209 U.S. 123 (1908), would be appropriate against the state defendants in light of remedies potentially available under the Federal Power Act. See *Armstrong v. Exceptional Child Center*, 135 S. Ct. 1378 (2015); *Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635 (2002). But none of the procedural disputes concerns subject-matter jurisdiction, which rests on both 28 U.S.C. §1331 (federal-question jurisdiction) and 16 U.S.C. §825p (authorizing suits in equity to enforce the Federal Power Act). Because the district court's jurisdiction is secure, we can go straight to the merits—for, if we decide that federal law does not preempt the state statute, none of the procedural issues matters.

At oral argument we expressed concern that the Federal Energy Regulatory Commission had not decided whether Illinois has interfered with its authority over auctions for interstate power. After receiving submissions from the litigants addressing the possibility of invoking the doctrine of primary jurisdiction (another non-jurisdictional doctrine, despite its name) and waiting for the FERC to act on petitions pending before it, we decided to ask the agency to give us its views as an *amicus curiae*. The Commission and the United States then filed a joint brief concluding that Illinois' program does not interfere with interstate auctions and is not otherwise preempted. More briefs from the parties followed, and the appeals are at last ready for decision.

The Federal Power Act divides regulatory authority between states and the FERC. The Commission regulates the sale of electricity in interstate commerce (including auctions conducted by regional organizations), while states regulate local distribution plus the facilities used to generate power. 16 U.S.C. §824(b)(1). This allocation leads to conflict, because what states do in the exercise of their powers affects interstate sales, just as what the FERC does in the exercise of its powers affects the need for and economic feasibility of plants over which the states possess authority. For decades the Supreme Court has attempted to confine both the Commission and the states to their proper roles, while acknowledging that each use of authorized power necessarily affects tasks that have been assigned elsewhere. See, e.g., *Federal Power Commission v. Southern California Edison Co.*, 376 U.S. 205 (1964); *FERC v. Electric Power Supply Association*, 136 S. Ct. 760 (2016).

*Hughes*, the most recent of these decisions, draws a line between state laws whose effect depends on a utility's participation in an interstate auction (forbidden) and state laws that do not so depend but that may affect auctions (allowed). 136 S. Ct. at 1297. The FERC has a policy that offers some price protection to new producers for the first three years of their participation in an auction. Maryland, concluding that three years is too short to encourage the addition of generation capacity, asked the Commission to increase the price-protection window to a decade. It declined. Maryland then decided to create price protection on its own by requiring older utilities to sign 20-year contracts with new entrants guaranteeing them a price floor, provided they sold their power in FERC-regulated auctions. As long as an entrant bid a price low enough to prevail in an auction, other producers had to make up the difference between that price and the guarantee. Because it is always possible to sell power in an auction by making a sufficiently low bid (PJM allows even negative bids, under which a producer offers to pay customers to take power off its hands), the Maryland system effectively allocated to new entrants a long-term right of first sale in the auction and in the process depressed the price that other producers would receive. This feature—that the subsidy depended on selling power in the interstate auction—is what led the Justices to conclude that Maryland had transgressed a domain reserved to the FERC.

The Court stressed that its decision covers only state rules that depend on participating in the interstate auction, stating: "States, of course, may regulate within the domain Congress assigned to them even when their laws incidentally affect areas within FERC's domain." *Hughes*, 136 S. Ct. at 1298. "Nothing in this opinion should be read to foreclose

[states] from encouraging production of new or clean generation through measures 'untethered to a generator's wholesale market participation.'" *Id*. at 1299. And that's what Illinois has done. To receive a credit, a firm must *generate* power, but how it sells that power is up to it. It can sell the power in an interstate auction but need not do so. It may choose instead to sell power through bilateral contracts with users (such as industrial plants) or local distribution companies that transmit the power to residences.

If a producer does offer power to an interstate auction, the value of a credit does not depend on its bid. True, the outcome of all PJM auctions, averaged over a year, may affect the value of a credit (if the average exceeds $31.40), but what (indeed, whether) a producer bids in the interstate auction does not determine the amount it receives. Every successful bidder in an interstate auction receives the price of the highest bid that clears the market. *Hughes*, 136 S. Ct. at 1293. The owner of a credit receives that market-clearing price, with none of the adjustments that Maryland law required. The zero-emissions credit system can influence the auction price only indirectly, by keeping active a generation facility that otherwise might close and by raising the costs that carbon-releasing producers incur to do business. A larger supply of electricity means a lower market-clearing price, holding demand constant. But because states retain authority over power generation, a state policy that affects price only by increasing the quantity of power available for sale is not preempted by federal law. "So long as a State does not condition payment of funds on capacity clearing the [interstate] auction, the State's program [does] not suffer from the fatal defect that renders Maryland's program unacceptable." *Id*. at 1299.

This does not imply that PJM, MISO, and the Commission are unconcerned about the effect of state programs designed to subsidize producers of electricity. PJM has asked the Commission to approve changes to its auction design in order to improve the system's price-discovery and output-allocation effects in the wake of laws such as the one Illinois enacted. Recently the FERC declined to approve PJM's proposal and opened a new proceeding so that the Commission may determine for itself what changes, if any, should be made to auctions for interstate sales of electricity. *Calpine Corp. v. PJM Interconnection, L.L.C.*, 163 FERC ¶61,236 (June 29, 2018). Plaintiffs insist that the need to revamp the auction system shows that the Illinois statute must be preempted.

But that's not what the Commission said. Instead of deeming state systems such as Illinois' to be forbidden, the Commission has taken them as givens and set out to make the best of the situation they produce. It wrote: "We emphasize that an expanded [Minimum Offer Price Rule] in no way divests the states in the PJM region of their jurisdiction over generation facilities. States may continue to support their preferred types of resources in pursuit of state policy goals." Order at ¶158. As the Supreme Court remarked in *Hughes*, the exercise of powers reserved to the states under §824(b)(1) affects interstate sales. Those effects do not lead to preemption; they are instead an inevitable consequence of a system in which power is shared between state and national governments. Once the Commission reaches a final decision in the ongoing proceeding, the adequacy of its adjustments will be subject to judicial review; the need to make adjustments in light of states' exercise of their lawful powers does not diminish the scope of those powers.

A few words about the Constitution and we are done. Plaintiffs invoke the dormant Commerce Clause and its rule that states may not discriminate against interstate transactions. See, e.g., *United Haulers Association, Inc. v. Oneida-Herkimer Solid Waste Management Authority*, 550 U.S. 330 (2007). Plaintiffs observe that the credits are bound to help some Illinois firms and contend that this condemns them. But this amounts to saying that the powers reserved to the states by §824(b)(1) are denied to the states by the Constitution, because state regulatory authority is limited to the state's territory. On this view, whenever Illinois, or any other state, takes some step that will increase or reduce the state's aggregate generation capacity, or affect the price of energy, then the state policy is invalid. That can't be right; it would be the end of federalism. The Commerce Clause does not "cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, [just because] the legislation might indirectly affect the commerce of the country." *General Motors Corp. v. Tracy*, 519 U.S. 278, 306 (1997).

The commerce power belongs to Congress; the Supreme Court treats silence by Congress as preventing discriminatory state legislation. Yet Congress has not been silent about electricity: it provided in §824(b)(1) that states may regulate local generation. In *Prudential Insurance Co. v. Benjamin*, 328 U.S. 408 (1946), the Court rejected a constitutional challenge to a statute that permits states to close their borders to insurance written in other states—a statute that even permits states to supersede national legislation on the topic of insurance. Section 824(b)(1) does not go that far; it does not authorize express discrimination. But it does mean that the balancing approach of decisions such as *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), which ask whether a state's interest

is strong enough to justify an interstate effect, does not apply to a state's regulation of electric capacity or a cross-subsidy between carbon-emitting generation and carbon-free generation.

Illinois has not engaged in any discrimination beyond what is required by the rule that a state must regulate within its borders. All carbon-emitting plants in Illinois need to buy credits. The subsidy's recipients are in Illinois; so are the payors. The price effect of the statute is felt wherever the power is used. All power (from inside and outside Illinois) goes for the same price in an interstate auction. The cross-subsidy among producers may injure investors in carbon-releasing plants, but only those plants in Illinois (for the state's regulatory power stops at the border). The combination of §824(b)(1) and the absence of overt discrimination defeats any constitutional challenge to the state's legislation.

AFFIRMED